No. 36,989

THE STATE, ex rel. ALFRED B. WILLIAMS, County Attorney, and THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF PRATT, *Plaintiff,* v. GEORGE ROBB, Auditor of the State of Kansas, *Defendant.*

(183 P. 2d 223)

Opinion filed July 12, 1947.

*John S. Dean, Jr.,* of Topeka, argued the cause, and *Alfred B. Williams,* of Pratt, was with him on the briefs for the plaintiffs.

*William Paul Timmerman,* assistant attorney general, argued the cause, and *Edward F. Arn,* attorney general, was with him on the briefs for the defendant.

*Hal E. Harlan* and *Ambrose M. Johnston,* both of Manhattan, *as amici curiae.*

The opinion of the court was delivered by

SMITH, J.: This is an original action in mandamus brought by the state on the relation of the county attorney of Pratt county to compel the auditor of state to register $800,000 of county hospital bonds which he had refused to register because he claimed this amount of bonds would be more than the county is authorized to issue under G. S. 1935, 10-301. The defendant filed a pleading denominated "Answer and Objections" to the issuance of a writ. The parties stipulated as to the facts. The cause was finally submitted on the question of whether a peremptory writ should issue.

Because several counties in the state will be affected by our decision and on account of the public nature of the matters involved we advanced the cause and it was submitted at the June session.

Briefly the facts are as follows:

·The assessed tangible valuation of Pratt county is $31,453,878. One percent of that assessed valuation is $314,538.78. The issue of bonds offered amounts to $800,000.

G. S. 1935, 10-301, provides as follows:

"Except for the refunding of outstanding debt, including outstanding bonds and matured coupons thereof, or judgment thereon, no bonds of any class or description shall hereafter be issued by any county, township, city, board of education or school district where the .total bonded indebtedness of such county or township would thereby exceed one percent of the assessment for taxation, as shown by the last finding and determination by the proper board of equalization or where the total bonded indebtedness of such city, school district or board of education would thereby exceed one and one-fifth percent of such assessment; but this restriction shall not apply to cities of the first class."

This is what is commonly known as the general bond limitation statute. If it applies to the present situation, then the auditor is correct and he should not register the entire $800,000 of bonds because such amount would exceed one percent of the assessed valuation of Pratt county. If it does not apply, then he is wrong and the bonds should be registered.

The bonds were issued pursuant to G. S. 1945 Supp. 19-1801 and 19-1801a. Those two sections are chapter 168 of the Laws of Kansas for 1945. They provide:

"Any county having less than 40,000 inhabitants may establish a .county hospital in the following manner: Whenever the board of commissioners of any county shall be presented with a petition signed by 25 percent of the resident freeholders of such county, 10 percent of whom shall not be residents of the city, town or village where it is proposed to locate such public hospital, asking that a tax may be levied for the establishment and maintenance of a public hospital at a place in the county named therein, and shall specify in the petition the maximum amount of money proposed to be expended in purchasing or building said hospital, such board of commissioners shall submit the question to the qualified electors of the county at the next general election to be held in the county, or if no general election shall be held within six months from the date of the presentation of said petition, then at a special election called for that purpose, if requested in the petitions, which tax shall not exceed two (2) mills on the dollar for any one year and be for the purchase of a site or sites and the erection thereon of a public hospital or hospital buildings, and for the support of the same; which tax shall be in addition to all other levies authorized by law and shall not be subject to the limita-

tions prescribed by section 79-1947 of the General Statutes Supplement of 1943 or acts amendatory thereof or supplemental thereto; which said election shall be held at the usual places in such county for electing county officers, the vote to be canvassed in the same manner as that for county officers.

"The board of county commissioners of any county which has voted in favor of the establishment and maintenance of a county hospital under the provisions of section 19-1801 of the General Statutes of 1935 or any amendments thereto is hereby authorized and empowered to issue bonds of such county for the purpose of purchasing a site, constructing or purchasing a hospital building and equipping the same. Such bonds shall be issued, sold and retired under the provisions of article 1, chapter 10 of the General Statutes of 1935 and acts amendatory thereof and supplemental thereto. The amount of bonds which may be issued hereunder shall not exceed the maximum amount stated in the original petition requesting the election for the establishment and maintenance of such hospital."

It will be noted that G. S. 1945 Supp. 19-1801, being section 1 of chapter 168, of the Laws of 1945, provides for a two-mill levy after the filing of a petition for the purchase of a site or sites and the erection thereon of a public hospital and for the support of this hospital. G. S. 1945 Supp. 19-1801a, being section 2 of chapter 168, provides that in counties where the people have voted in favor of the establishment and maintenance of a county hospital under the provisions of the foregoing section, the commissioners are authorized to issue bonds of the county for the purpose of purchasing a site and constructing or purchasing a hospital building and equipping it. The section then provides that these bonds shall be issued, sold and retired under the provisions of article 1, chapter 10 of the General Statutes of 1935 and acts amendatory thereof and supplemental thereto. The last sentence provides that the amount of bonds which may be issued under the act shall not exceed the maximum amount stated in the original petition requesting the election for the establishment and maintenance of a hospital. This sentence above undoubtedly refers to the petition which G. S. 1945 Supp. 19-1801 provides must be signed by 25 percent of the resident freeholders of the county before the election can be called. It should be noted in passing, however, that the two percent levy, as provided for in G. S. 1945 Supp. 19-1801 is for the purchase of a site or sites and the erection thereon of a hospital and the support of it, while the next section, that is, G. S. 1945 Supp. 19-1801a, provides for the issuance of bonds for the purchasing of a site or constructing or purchase of a hospital building and equipping it, and has no provision about supporting it. G. S. 1943 Supp. 79-1947, to which reference

is made in G. S. 1945 Supp. 19-1801 is the general tax limitation statute for counties. It need not concern us here.

The plaintiffs point out first that G. S. 1945 Supp. 19-1801a provides that the bonds isued thereunder shall be issued under the provisions of article 1 of section 10, G. S. 1935. They argue that since the statute provides that the hospital bonds should be issued under the provisions of the foregoing chapter and section and since the general limitation statute, that is, G. S. 1935, 10-301, is a part of article 3, not article 1, the legislature did not intend for that statute to be a limitation upon the bonds issued pursuant to section 19-1801a.

This argument sends us to an examination of article 1 of chapter 10 of G. S. 1935. This article, being G. S. 1935, 10-101 to 10-127 is a general bond statute for municipalities. It sets out generally the manner in which bonds shall be issued. G. S. 1935, 10-103 provides that all municipal bonds shall run not longer than 20 years with interest at the rate of not to exceed five percent and other provisions of a like nature. G. S. 1935, 10-101 provides for a limitation on improvement bonds. G. S. 1935, 10-105 provides how the bonds shall be signed by the officers. G. S. 1935, 10-106 provides how they shall be sold. G. S. 1935, 10-107 provides for their being registered. G. S. 1935, 10-108 provides that before they become valid, a transcript of the bonds shall be filed with the state auditor. G. S. 1935, 10-109 provides for a statement for the benefit of the auditor. There are other provisions of a like nature in the article. Nowhere in the article is there a limitation as to the amount of bonds that may be issued by a county. These provisions would have applied to bonds issued pursuant to G. S. 1945 Supp. 19-1801 and 19-1801a, even had no reference to them been made when the statute was enacted. They simply provide the procedural steps for issuing bonds.

Article 2 of chapter 10 of the General Statutes of 1935 provides for the issuance of bridge and poor bonds. Article 3 contains G. S. 1935, 10-301, which we have already quoted in this opinion.

This section was enacted for the first time apparently as section 3 of chapter 50 of the Laws of 1879. It has appeared in almost the same form in every compilation of laws since that time. Other municipalities than counties have been taken out of it by subsequent enactments. (See *Arkansas City v. Turner*, 116 Kan. 407, 226 Pac. 1009.) It is still a familiar provision, however, to all county officers who are interested in issuing bonds and those who are interested in

examining transcripts for the benefit of bond purchasers. In one way or another it has been before this court many times. It is a part of the policy of this state to safeguard the taxpayers of the counties of the state by preventing as nearly as possible the issuance of an excessive amount of bonds having regard to the assessed valuation of the counties. In very few instances have Kansas municipalities ever defaulted on their bonds. It is so well established as the legislative policy of this state that we would not strike it down by interpretation of a statute unless it clearly appeared that such was the intention of the legislature.

The plaintiffs argue that had the legislature intended that the limitation contained in G. S. 1935, 10-301, should be a limitation on the amount of bonds that might be issued pursuant to section 2 of chapter 168 of the Laws of 1945 (G. S. 1945 Supp. 19-1801a), it woud have made some reference to the section in the enactment of chapter 168, whereas it only referred to article 1, which is a preceding article. The contrary is the correct rule, as stated by this court. In *State, ex rel., v. Wyandotte County,* 101 Kan. 430, 166 Pac. 520, we were considering the question of whether or not certain bridge and refunding bonds should be considered in calculating whether the outstanding bonded indebtedness of Wyandotte county exceeded the one percent of its assessed valuation, as provided by the statute we are discussing. It was argued that for certain reasons the refunding bonds should not be included in this one percent. This court held that they should be included and said:

"If the legislature had intended to exclude them from future estimate of the total bonded indebtedness of the county, doubtless it would have declared its intention in unmistakable terms." (p. 433.)

Since this case was submitted we have been favored with an able brief as *amici curiae,* by counsel who represent Riley county, which is in much the same situation as Pratt county. Counsel in this brief point out that the general bond limitation statute, that is, G. S. 1935, 10-301, has been on the books since 1879. They point out that county hospitals were first authorized in 1913. They argue that the limitations enacted in 1879 was only intended to cover the type of bonds which were generally issued at the time that statute was first enacted, and since there were no county hospital bonds at that time, that what this court said in *State, ex rel., v. Robb,* 143 Kan. 527, 55 P. 2d 815, is in point. There we were considering the question of whether counties were limited in their issuance of poor relief bonds by the

terms of G. S. 1935, 10-301. We said there was room for argument that the legislature in enacting that statute had in mind only the kinds and classes of bonds then known to our law and it could not be said that the legislature intended it to apply to the kind or classes of bonds then unknown. The court in that case was considering a statute which provided for the issuance of poor relief bonds under certain circumstances. The act itself contained a limitation that in 1935 amount of bonds should not exceed one-third of one percent of the valuation, and in 1936 one-half of one percent and in 1937 one-tenth of one percent. While this court did use the language to which reference has been made, we in fact held that by the provisions just referred to as far as poor relief bonds were concerned the act really amended G. S. 1935, 10-301. The opinion also stated various other grounds than the ones to which reference has been made, upon which the conclusion reached in it was based. We cannot give the opinion the weight urged upon us by counsel.

Counsel in their brief as *amici curiae* also point out one other provision which they argue requires us to follow the rule announced in *State, ex rel., v. Robb,* supra. That is the last sentence in G. S. 1945 Supp. 19-1801a, which reads:

"The amount of bonds which may be issued hereunder shall not exceed the maximum amount stated in the original petition requesting the election for the establishment and maintenance of such hospital."

This provision makes no reference whatever to the relationship which the amount of the bonds to be issued bears to the assessed valuation of the county. That is the important criterion for the reason heretofore stated in this opinion. It is merely a safeguard so that the amount of the bonds which could be issued following the election will not exceed the amount provided in the petition signed by twenty-five percent of the resident freeholders of the county.

We conclude that the limitation provided for in G. S. 1935, 10-301, applies to bonds issued pursuant to G. S. 1945 Supp. 19-1801a. We are fortified in this conclusion somewhat by events that transpired in the session of the legislature for 1947 and which now require our consideration. At that session senate bill 222 was introduced. It provided that G. S. 1935, 10-301 should be amended so that the limitation provided therein would not apply to bonds issued pursuant to G. S. 1945 Supp. 19-1801a. At the same time house bill 131 was introduced. As introduced it provided that G. S. 1935, 10-301, be amended in certain particulars, with which we are

not interested. It passed the house after some amendments with which we are not now concerned. It was sent to the senate in due course. There it was amended in the committee on federal and state affairs by insertion of the following language:

"But this restriction shall not apply to the issuance of bonds purusant to Article 3a of Chapter 39 of the General Statutes of 1935 or acts amendatory thereof or supplemental thereto; and this restriction shall not apply to the issuance of bonds pursuant to Article 18 of Chapter 19 of the General Statutes of 1935 or acts amendatory thereof or supplemental thereto."

It was duly passed by the senate and as so amended was messaged to the house; the house concurred in the amendment. It seems the bill was duly engrossed, still containing the last amendment, and in due time was enrolled. It appears, however, that the copy of the bill as it went to the state printer had this particular amendment typed on a separate piece of paper and attached to the back of the bill. The copy of the amendment did not come to the attention of the employees at the state printing plant and on the return of the bill to the house and senate no one noticed that the amendment had not been printed as part of the bill, and it was signed by the officers of both houses without the amendment. In that form it was submitted to the governor and duly signed by him. The result is that the bill as passed by both houses of the legislature contained the senate amendment, which would have provided that the limitation provided for in G. S. 1935, 10-301 did not apply to bonds issued pursuant to G. S. 1945 Supp. 19-1801a. But as signed by the officers of both houses and duly signed by the governor the bill did not contain such a provision.

The fact that senate bill 222 was introduced and that the proposed amendment to house bill 131 was adopted and passed fortifies us somewhat in the argument that the legislature thought the provisions of G. S. 1935, 10-301 applied to the bonds in question and that it would require an amendment of that section to prevent that result. Both parties agree the governor would have signed house bill 131 with the amendment in it had it been so submitted to him.

Plaintiffs argue this court should take judicial notice of what the enrolled bill contained and what the legislative journal contained, and of every step that might affect the validity or meaning of this statute. They argue that enrolled bills may be impeached by an examination of the legislative records of the house and senate, and

that when that is done, it becomes clear that it was the intention of the house and senate and governor, that the bill as passed by both houses with the amendment added in the senate should be construed to be the effective bill. They point out that to hold otherwise would permit the enrolling clerk to impair or invalidate or change an act by dropping out a provision by inadvertence, carelessness or fraud, and that this would be obviously against public policy.

To sustain this position plaintiffs cite and rely on the following Kansas authorities: *Comm'rs of Leavenworth Co. v. Higginbotham,* 17 Kan. 62 ; *Division of Howard Co.,* 15 Kan. 194; *Prohibitory-Amendment Cases,* 24 Kan. 700; and *Weyand v. Stover, Treas.,* 35 Kan. 545, 11 Pac. 355.

Those cases are authority for a holding that this court will look behind the language of the enrolled bill to the legislative journals and other records when the constitutionality or meaning of a bill is being considered. They are not authority for the conclusion which plaintiffs seek to draw therefrom, that is, that where the house and senate pass one bill and the governor signs another, we should hold the bill passed by the house and senate to be the law. On the question of the weight to be attached to the fact that a bill was finally enrolled G. S. 1935, 45-113 should be considered. That section provides in part:

"All bills or joint resolutions which shall have passed both houses of the legislature shall be enrolled by printing at the state printing plant on parchment paper, and such printed bills or resolutions shall be taken and held by the legislature and by each house thereof and by all courts to be the only proper enrolled bill or joint resolution."

Plaintiffs cite and rely on some decisions from other states, however, which require rather careful study. The following cases are cited: *Haney v. The State,* 34 Ark. 263; *Chicot County et al. v. Davies,* and *Burks v. Jefferson County,* 40 Ark. 200; *Athletic Min. & Smelt. Co. v. Sharp,* 135 Ark. 330, 205 S. W. 695; *Rice v. Road Imp. Dist.,* 142 Ark. 454, 221 S. W. 179; *Ford v. Plum Bayou Road Imp. District,* 162 Ark. 475, 258 S. W. 613; *State, ex rel. Casper v. Moore,* 37 Neb. 13, 55 N. W. 299; and *State v. Wright,* (Wyo.), 163 P. 2d 190.

We shall first discuss the Arkansas decisions.

*Haney v. The State,* supra, was a case where the legislature obviously intended to use the word "fourth" in an act providing when

court should be held in various counties in a district. The court held that the use of the word "fifth" was clearly a typographical error; that the context showed the legislature intended the use of the word "fourth" and that the act should be so interpreted. The question with which we are confronted was not in the case.

·Chicot County et al. v. Davies and Burks v. Jefferson County, supra, were heard and decided together. The bill in question conferred power on counties to subscribe to stock in railroads upon certain conditions. As originally introduced, it provided, that upon application of the company "and" a hundred voters of the county, a popular vote should be had to determine whether the county should buy stock in the company. In the house an attempt was made to amend the bill by substituting the word "or" for "and," so that had the bill been passed and signed by the governor in that form the election could have been called if either one of those contingencies occurred. The wording of the house amendment was such, however, that it was not intelligible. As the bill was finally enrolled and passed by both houses and signed by the governor the word "and" was used so that both contingencies must happen in order to have the election. The argument was made that the bill was invalid because as passed by the house with the amendment in, it was not the bill that was signed by the governor. The constitution of Arkansas did not require amendments to bills to be entered upon the journals. The court to uphold the act held that it would presume that the house receded from its amendment and that the enrolled bill was finally passed by the house. Clearly this opinion is not authority for the position of plaintiffs here.

Athletic Min. & Smelt. Co. v. Sharp, supra, was an action for personal injuries. A statute on comparative negligence had been enacted in Arkansas, being Act 175 of the Laws of Arkansas for 1913. If this act covered the cause of action pleaded, then the defense of contributory negligence was not available to the defendant.

As printed in the session laws for Arkansas, section 2 of chapter 175 provided as follows:

"That in all actions hereafter brought against any such corporation under or by virtue of any of the provisions of this Act to recover damages for personal injuries [to an employee, or where such injuries] have resulted in his death, the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury (and not by the court) in proportion to the amount of negligence attributable to such employee: Provided, that no such employee who may be injured or

killed shall be held to have been guilty of contributory negligence in any case where the violation of such corporation of any statute enacted for the safety of employees contributed to the injury or death of such employee.".

The words in the third line "to an employee, or where such injuries" were inserted by the secretary of state of Arkansas. These words appear in a bracket in the session laws. The record showed that these words above quoted were not in the enrolled bill that passed the legislature and was signed by the governor but were inserted by the secretary of state after the bill was returned to him by the governor. The supreme court of Arkansas stated that examination of the original bill in the office of the secretary of state showed that the words were in the original bill and the omission from the enrolled bill was an error or misprision of the enrolling clerk. The Supreme Court said:

"The secretary of state, therefore, properly inserted these in the printed act."

It is clear that the supreme court of Arkansas dealt with this as though it was a clerical error if nothing more. It is interesting to note that one justice dissented from this opinion but did not write a dissenting opinion.

The provision of the constitution of Arkansas with reference to the governor signing bills was very similar to ours at that time, that is, it required the bill when it had passed both houses should be presented to the governor for signature. If he did not approve it, he should return it with his objections to the house in which it had originated. There was a provision for reconsideration by the legislature. There was also a provision that any bill that should not be returned by the governor within five days (Sunday excepted) after it had been presented to him should become law without his signature unless the general asembly by adjournment prevented its return, in which case it should become a law unless the governor filed the bill with his objections thereto with the secretary of state and gave notice thereof by public proclamation.

The next Arkansas case we shall discuss is *Rice v. Road Imp. Dist.*, supra. This is a case in which the bill in question had passed both houses in the form as originally introduced without any amendment whatever. The bill created a road benefit district and described certain sections of land which were to be included in the district. These various sections were set out in different paragraphs of the act. When the bill was enrolled, that is, when the enrolling clerk copied it from the original bill, the paragraph that described

512

the sections of land in question was not copied. The enrolled bill was presented to the governor and duly signed by him. An action was brought in due time to prevent the building of the road pursuant to the act. The argument was first made that the bill was not presented to the governor in time. The supreme court held against that argument and with that we are not here concerned. The court then said:

"The chief insistance for reversal is that the bill approved by the Governor was a different bill from the bill passed by the Legislature." (p. 459.)

It is clearly apparent that the bill presented to the governor in this case was not the bill that had been passed by both houses. The Arkansas supreme court said, however:

"In approving an enrolled bill, therefore, it may aptly be said that the Governor intends to, and does, approve the original or identical bill passed by the General Assembly. For this reason, additions, omissions or misprisions of the enrolling clerk in copying the bill to be signed by the Speaker of the House and President of the Senate and to be presented to the Governor, do not impair or invalidate the act. Otherwise, legislation would depend entirely upon the accuracy of the enrolling clerk and care of the enrolling committee." (p. 459.)

Then follows a discussion that the enrolled bill is not positive evidence of what was actually passed by the legislature but that it may be impeached by an investigation of the records of both houses.

It seems on first blush that the holding in this case is authority for the argument being made by the plaintiffs and that if we cared to follow the rule in *Rice v. Road Imp. Dist.*, supra, we should order judgment for the plaintiff. It is worth noting, however, that the Arkansas court treated the difference between the two bills as purely a clerical error, which no doubt it was.

On the question of whether or not we care to follow this opinion it is worth noting first that the same justice who wrote the dissent in *Athletic Min. & Smelt. Co. v. Sharp*, supra, concurred specially in the conclusion reached in this case. He concurred rather than dissented because he considered the court bound by the holding in the case of *Athletic Min. & Smelt. Co. v. Sharp*, supra, but he stated that he still did not agree with that holding. He said:

"No doubt the Governor might approve the original bill, if it were presented to him for his approval; but here the original bill was not presented to him. Upon the contrary, a materially different bill was presented to him for his approval. Are we warranted in assuming that the Governor is a mere automaton, whose business it is to sign anything presented to him? Is it not

the theory of the Constitution that the Governor shall exercise an independent and intelligent judgment in considering and approving bills which are to become laws, and is he not warranted in basing that consideration upon the bill presented to him, and does he not have the right to assume that the bill presented to him for his consideration and approval is the very bill which the Legislature has passed? Have we not here sustained the very act under review by indulging the presumption that officers do their duty, and if there is such a presumption may the Governor not rely upon it in determining what action he will take upon a particular bill, or any bill, presented to him for his approval? And is it to be assumed that, because he is willing to give assent to the bill becoming a law which is presented to him, he would also assent that any other bill dealing with the same subject, although materially different, should likewise become a law?" (p. 463.)

It is also worthy of note that one other justice dissented from the conclusion reached in this case on the ground that the bill was not presented in time. Another justice dissented because he thought that *Athletic Min. & Smelt. Co. v. Sharp,* supra, should be overruled. This justice stated:

"The conclusion announced in that case is directly opposed to the plain mandate of the Constitution, which makes the Governor an essential part of our scheme of legislation in that it provides that each bill must be presented to him for his approval. If a materially different bill is presented to the Governor, then he is given no opportunity to approve or disapprove the legislation sought to be enacted by the two houses of the General Assembly." (p. 468.)

*Ford v. Plum Bayou Imp. District,* supra, was another case where the enrolled bill, which was signed by the governor, did not contain a description of certain land, which the engrossed bill had contained. The court upheld the act following *Athletic Min. & Smelt. Co. v. Sharp,* supra, and *Rice v. Road Imp. Dist.,* supra.

*State, ex rel. Casper, v. Moore,* supra, was a case where the original bill provided for an appropriation of $25,000 for the purpose of paying the expenses of impeachment proceedings. In a conference committee the bill was amended by reducing the amount of the appropriation from $25,000 to $15,000. In the committee on enrolled bills, however, the $15,000 item was changed to $25,000. In that condition it was signed by the officers of both houses and by the governor. When the bill was attacked the supreme court of Nebraska said that it was clear that both houses concurred in the appropriation of $15,000 and that the governor approved that. The court said:

"The governor, by signing the bill as enrolled, expressed his approval of

an appropriation of $25,000. We think that, this sum being one greater than that provided by the legislature, his approval thereof included an approval of the lesser sum." (p. 17.)

On account of the theory upon which this bill was approved by the supreme court of Nebraska, it is not authority for the position of plaintiffs here.

*State v. Wright,* supra, is a case where the bill in question had to do with the distribution of gasoline tax revenue. Everyone agreed that 75 percent of the revenue should go to the highway commission. As to the remaining 25 percent the counties maintained in the legislature that it should be divided amongst them, while the cities of Wyoming of over 1,500 population maintained some portion of it should be divided amongst them. As originally introduced, the bill provided that 23 percent of these revenues should go to the counties and two percent to cities of over 1,500 population. This provision was amended in the house to change the 23 percent to 25 percent but the two percent to cities was not changed. Then ensued a contest between the house and senate, with the result that a conference comittee report was finally adopted, which provided for a distribution of 23 percent to the counties and two percent to cities of over 1,500 population. There was no doubt that the bill as passed by both houses so provided. When the bill was enrolled; however, the figure "23" was changed to "25." As so changed, it was signed by the officers of both houses and sent to the governor. The governor found the discrepancy and when he returned the signed bill to the secretary of state instead of the legislature—because in the meantime the legislature had adjourned— he pointed out that the bill as presented to him was not the bill actually passed. He pointed out, however, that as the provision for a distribution of two percent to the cities was unchanged, and since it seemed that part could be separated from the rest of the bill, he signed it.

In an original proceeding in mandamus the state argued that only 23 percent should be distributed to the counties. Counsel for some of the counties pointed out the history of the bill as detailed here and argued that the entire bill was void and the distribution should be made on the basis of the old statute.

The supreme court of Wyoming examined and commented on many authorities, some of which have been discussed here. The court first concluded that the court might look behind the en-

rolled bill to ascertain if it was constitutionally passed following *State, ex rel., v. Swan,* 7 Wyo. 166, 51 Pac. 209. The court finally discussed *State, ex rel. Casper, v. Moore,* supra, which has already been referred to, and chose to follow it. The court said:

"The legislation in the case at bar is in the nature of an appropriation bill, in which the rule that the greater includes the less may well be applied. And it may be that the rule of *State, ex rel., v. Moore* cannot be extended to any other class of cases. We do not know of any sound reason why we should dissent from the Nebraska court in this case. Mistakes do occur, and it might be found unfortunate in the future in connection with appropriation and similar bills if we should now take a position contrary to *State, ex rel., v. Moore.*" (*State v. Wright,* [Wyo.], 163 P. 2d 190, 197.)

The concluding paragraph in the opinion is interesting. It is as follows:

"It follows, accordingly, that the words 'twenty-five' in the first line of section 7 (1) of Chapter 72, Session Laws of 1935, as amended by Chapter 157 of the Session Laws of 1945, should be read 'twenty-three,' and as thus amended, the act should be upheld. The writ of mandamus asked for will be denied. No costs will be taxed in this case." (p. 197.)

It will be seen the court actually amended this act by changing the figures "25" to "23."

The foregoing are the authorities upon which plaintiffs rely. We shall consider whether they compel a judgment for plaintiffs. They seem to fall into two classifications, one where a typographical or clerical error was corrected—the other where by signing a bill with a large figure in it the governor was held to have in effect approved a bill with a smaller figure. The fact is, these opinions, most of them seem to have been based on reasons of expediency rather than any well-reasoned philosophy of constitutional law. The Arkansas cases are a good illustration of what happens when the first step is taken in constitutional law for reasons of expediency. In *Haney v. The State,* supra, the change was small and was easily made. When it came to *Rice v. Road Imp. Dist.,* supra, and *Athletic Min. & Smelt. Co. v. Sharp,* supra, many years later, using the early case as a precedent an act quite different from the one approved by the governor was declared to be the law. In all of them the difference between the bill that was enrolled and signed by the governor and the bill that passed both houses and was held to be the law was only incidental to the provisions of the bill itself.

In the making of laws under our constitution the governor and the legislature are coördinate branches. That is the way the writers

of the constitution intended it should be. The one is about as important as the other. The court will not for reasons of expediency reach a conclusion that will enable either one to bypass the other.

The constitution provides that each house shall keep a record of its yea and nay votes in a journal (art. 2, sec. 10). Any member may protest against any act or resolution (art. 2, sec. 11). A bill may originate in either house (art. 2, sec. 12). A majority of all the members elected to each house, voting in the affirmative, shall be necessary to pass any bill or joint resolution (art. 2, sec. 13). Every bill shall be read on three separate days in each house, unless in case of emergency. Two-thirds of the house in which such bill is pending may, if deemed expedient, suspend the rules; but the reading of the bill by sections on its final passage shall in no case be dispensed with (art. 2, sec. 15). No bill shall contain more than one subject, which shall be clearly expressed in its title, and no law shall be revived or amended, unless the new act contain the entire act revived or the section or sections amended, and the section or sections so amended shall be repealed (art. 2, sec. 16).

The provision for submitting a bill to the governor for his signature is article 2, section 14. It reads as follows:

"Every bill and joint resolution passed by the house of representatives and senate shall, within two days thereafter, be signed by the presiding officers, and presented to the governor; if he approve, he shall sign it; but if not, he shall return it to the house of representatives, which shall enter the objections at large upon its journal and proceed to reconsider the same. If, after such reconsideration, two thirds of the members elected shall agree to pass the bill or resolution, it shall be sent, with the objections, to the senate, by which it shall likewise be reconsidered, and if approved by two thirds of all the members elected, it shall become a law; but in all such cases the vote shall be taken by yeas and nays, and entered upon the journals of each house. If any bill shall not be returned within three days (Sundays excepted) after it shall have been presented to the governor, it shall become a law in like manner as if he had signed it, unless the legislature, by its adjournment, prevent its return, in which case it shall not become a law. If any bill presented to the governor contains several items of appropriation of money, he may object to one or more of such items, while approving the other portion of the bill; in such case he shall append to the bill at the time of signing it, a statement of the item or items to which he objects, and the reasons therefor, and shall transmit such statement, or copy thereof, to the house of representatives, and any appropriations so objected to shall not take effect unless reconsidered and approved by two thirds of the members elected to each house, and, if so reconsidered and approved, shall take effect and become a part of the bill, in which case the presiding officers of each house shall certify on such bill such fact of reconsideration and approval." (Const., art. 2, § 14.)

This section is clear. There can be no doubt but that each bill passed must be presented to the governor, and if he approves it he shall sign it, and if not he shall return it with his reasons. The rest of the section deals with the power of the legislature to override a veto by vote of two-thirds.

The judiciary is merely one of the three branches of the state government. It should be slow to approve any action which even has the semblance of permitting one branch to act toward another in a manner contrary to the terms and provisions of the constitution.

It is difficult to say that this amendment was merely incidental to the general purposes of house bill 131. The omission did not leave the original bill any less clear or effective for the purposes for which it was introduced. The first section does provide for an amendment of G. S. 1935, 10-301, but not in respect to the one with which we are here concerned.

Section 2 amended G. S. 1935, 10-303, a provision as to bonds of second and third class cities.

The purpose to be accomplished by the amendment was deemed important enough to be the subject of a separate bill, senate bill 222.

In *Katerndahl v. Daugherty*, 30 Ida. 356, 164 Pac. 1017, the question we have here was dealt with by merely stating it. On account of the public nature of this bill, and because it is so regrettable that such a mistake was made, we have examined the matter somewhat at length.

In *Vaughn & Ragsdale Co. v. State Board, etc.*, 109 Mont. 52, 96 P. 2d 420, the subject received careful consideration. The court held:

"The legislature alone cannot enact a law; it has the power to pass bills which may become laws when signed by the presiding officers of both houses and when approved and signed by the governor, these officers being an indispensable part of the machinery set up by the Constitution to make laws." (p. 52.)

Perhaps a statement, as nearly as possible, as to how this mistake came about is not untimely. The bills in our legislature all have brown-colored wrappers, each resembling the other in appearance. One of these was put on this bill when it was introduced, a small amendment was made in the house, so the bill before being sent to the senate was engrossed with this amendment written in as part of the bill, this engrossed bill received another brown wrapper, with the notation on the outside of what had so far happened to it

(that made two house bills No. 131), then in the senate the bill was amended, as we have noted. The amendment was attached to the engrossed bill from the house and the bill itself was reëngrossed with the amendment written out as a part thereof. A brown wrapper was put on this bill and it found its way to the proper clerk in the house. That made three house bills 131, each with a brown wrapper on. When the bill was to be sent to the state printer to be printed as an enrolled bill the clerk inadvertently picked up the copy that had the senate amendment attached to it rather than the bill that had been typed up with the amendment written in, hence the mistake. The fact remains, however, that the bill that passed the legislature never was submitted to the governor.

It follows that the amendment did not become effective and judgment in this action must be entered for the defendant.