No. 53,477

STATE OF KANSAS, *ex rel.,* ROBERT T. STEPHAN, Attorney General, *Petitioner,* v. PHILIP W. MARTIN, Director of Property Valuation, Kansas Department of Revenue, *Respondent.*

(641 P.2d 1011)

Opinion filed February 27, 1982.

*Rodney J. Bieker,* assistant attorney general, argued the cause and *Robert T.*

*Stephan,* attorney general, and *Dan Biles,* assistant attorney general, were with him on the brief for petitioner.

*Carol B. Bonebrake,* of the Department of Revenue of the State of Kansas, Legal Services, argued the cause and was on the brief for respondent.

The opinion of the court was delivered by

HOLMES, J.: This is an original action in quo warranto filed in this court on the petition of the Attorney General of Kansas, to oust the Director of Property Valuation from valuing and assessing oil and gas leases and properties in accordance with K.S.A. 1981 Supp. 79-331 as enacted by the 1979 Legislature. The Attorney General contends the statute, as amended in 1979, is unconstitutional.

This action was brought by the State on the relation of the Attorney General pursuant to Article 3, Section 3 of the Kansas Constitution and K.S.A. 60-1202. This court has recognized on several occasions that in a proper case an original action in quo warranto is an appropriate procedure to question the constitutionality of a statute. See *State ex rel. Tomasic v. Kansas City, Kansas Port Authority,* 230 Kan. 404, 636 P.2d 760 (1981); *State ex rel. Stephan v. Carlin,* 229 Kan. 665, 630 P.2d 709 (1981); *State, ex rel., v. Dwyer,* 204 Kan. 3, 460 P.2d 507 (1969). The matter has been submitted to this court on an agreed statement of facts and we find the respondent's attack upon the standing of the attorney general to bring this action to be without merit. The court has determined that it will take jurisdiction of the controversy.

K.S.A. 79-331 (Weeks 1977) provided:

"In determining the value of oil and gas wells or properties the assessor shall take into consideration the age of the wells, the quality of oil or gas being produced therefrom, the nearness of the wells to market, the cost of operation, the character, extent and permanency of the market, the probable life of the wells, the quantity of oil or gas produced from the wells, the number of wells being operated, and such other facts as may be known by the assessor to affect the value of the property.

"Whenever a county board of equalization or the state board of equalization shall make a change in any of the factors or figures used in determining the eight-eighths (8/8ths) valuation of the production for any oil or gas well or lease, such change shall apply to the working interest, royalty interest, overriding royalty interest and production payments."

The first paragraph of the foregoing statute was first enacted in 1917 and the second paragraph was enacted in 1969. In 1979 the Legislature amended the statute by adding subsections (*b*) and (*c*)

effective January 1, 1980, and as enrolled and signed by the Governor it reads:

"(a) Except as otherwise provided in subsection (b) of this section . . . [the balance of this subsection is identical to the statute quoted above.]

"(b) The valuation of the working interest and royalty interest, except valuation of equipment, of any original base lease or property producing oil or gas for the first time in economic quantities on *and* after July 1 of the calendar year preceding the year in which such property is first assessed shall be determined for the year in which such property is first assessed by determining the quantity of oil or gas such property would have produced during the entire year preceding the year in which such property is first assessed upon the basis of the actual production in such year and by multiplying the income and expenses that would have been attributable to such property at such production level, excluding equipment valuation thereof, if it had actually produced said entire year preceding the year in which such property is first assessed by sixty percent (60%).

"(c) The provisions of subsection (b) of this section shall not apply in the case of any production from any direct offset well or any subsequent well on the same lease." L. 1979, ch. 310. (Emphasis added.)

The 1979 amendments were adopted by the legislature in an attempt to address a problem of ad valorem tax valuation which is peculiar to the oil and gas industry. It has long been recognized that when a new well is completed it will ordinarily produce at a far greater rate than will be customary for that particular well after only a few weeks or months have elapsed. This initial excessive production is referred to as "flush production" and, if used as one of the factors for determining value, is misleading and often results in excessive valuation and assessment for the initial year of taxation. Prior to the amendments local assessors often failed or refused to take into consideration the "flush production" feature of new wells and for wells completed late in the year would merely annualize the initial "flush production" and arrive at a greatly inflated production factor resulting in excessive valuation and assessment along with other consequences detrimental not only to the oil and gas producers and royalty owners but to the public at large. The problems as testified to before the legislature and as summarized in the parties' stipulation of facts were:

"A. Legislation was needed to correct the assessment practices in the State of Kansas which resulted in an over-assessment of production when wells were completed in the latter part of each year.

"B. The over-assessment resulted from the failure or refusal of certain county

appraisers to make an adequate adjustment for 'flush production' and the rapid declines which necessarily followed.

"C. Kansas producers and operators often would elect not to complete wells prior to the end of the calendar year in order to avoid over-assessment on the resulting production.

"D. The decision not to complete a well prior to the end of the calendar year often had unpleasant federal income tax consequences for the operator or producer.

"E. Legislation would be beneficial to all concerned in that wells would be put into production at an earlier time thereby adding valuation to the ad valorem tax base while giving some recognition to the over-assessment problem resulting from 'flush production.' "

## Additional stipulations include:

"6. While most production in Kansas follows a constant percentage decline with time (*i.e.*, a plot of the logarithm of production versus time forms a straight line), the initial production and its decline will differ greatly from that constant percentage decline.

"7. The failure to make an allowance or adjustment for sharp declines and/or flush production results in an over-valuation of the mineral reserve, if all other factors concerning the value of the lease are properly applied.

"12. Apparently in response to the foregoing testimony, the Legislature, in 1979, amended K.S.A. 79-331 to require minimal recognition of the flush production factor, and the resulting over-assessment problem, thus encouraging producers and operators to put wells into production at an earlier time, thereby adding valuation to the ad valorem tax base of the producing counties, and entitling the producers and operators to the income from the early production and receipt of favorable federal income tax consequences.

"13. The adjustment factor provided for in K.S.A. 1980 Supp. 79-331(b) does not exceed the actual flush production declines experienced by the Industry, . . .

"15. . . . the adjustment of 40% accorded K.S.A. 1980 Supp. 79-331(b) does not approach the actual adjustment which would have been appropriate.

"16. In Kansas, the projected production curve of a newly discovered well will normally begin to demonstrate its real characteristics (*i.e.*, production coupled with its rate of decline) after the first six to twelve months of production.

"17. The first well on an original base lease is the production which lacks a 'track record' and is a true unknown.

"18. Subsequent wells on the same lease or proximate to the first well normally will have production histories indicative of, or parallel to, that of the first well on the original base lease.

"19. Prudent industry standards in Kansas dictate that a subsequent well (be it a direct offset or subsequent well on the same lease) not be developed until such time as the first well has a demonstrated production history, although two wells can be, and have been, made to produce in paying quantities on a single lease, within six months.

"20. The Division of Property Valuation has, since the enactment of K.S.A. 1980 Supp. 79-331(b) and (c), implemented the same by directing that said adjustment factor be utilized for those first wells on an original base lease which commence production in paying quantities on or after July 1, of the prior year."

The petitioner asserts several grounds in support of his allegation that K.S.A. 1981 Supp. 79-331 is unconstitutional:

(1) The statute as set forth in Chapter 310 of the 1979 Session Laws of Kansas and in K.S.A. 1980 (now 1981) Supp. 79-331 is not the same as passed by the legislature and therefore the statute was not enacted in compliance with Article 2, Section 14 of the Kansas Constitution.

(2) The provisions of subsections (*b*) and (*c*) of the statute violate Article 11, Section 1 of the Kansas Constitution in that they provide a method of assessment and taxation which is not on a uniform and equal basis with other property that is subject to general ad valorem taxation.

(3) The provisions of subsection (*b*) and (*c*) result in invidious discrimination inconsistent with the provisions of Article 11, Section 1 of the Kansas Constitution.

At the outset we will once again iterate certain principles to be followed by this court when the constitutionality of a statute is at issue.

"We start with the proposition that the constitutionality of a statute is presumed; that all doubts must be resolved in favor of its validity, and before the statute may be stricken, it must clearly appear the statute violates the Constitution. It is the court's duty to uphold the statute under attack, if possible, rather than defeat it. If there is any reasonable way a statute may be construed constitutionally permissible, that should be done." *Board of Greenwood County Comm'rs v. Nadel,* 228 Kan. 469, Syl. ¶ 1, 618 P.2d 778 (1980).

Petitioner's first attack on the statute is that the statute as signed by the Governor and printed in the session laws and subsequent supplements to K.S.A. is not identical to the bill as approved by the legislature. We have hereinbefore set forth the statute as it was signed by the Governor and as it now appears on the statute books. Subsection (*b*) of the statute as passed by the legislature read in part:

"(*b*) The valuation of the working interest and royalty interest, except valuation of equipment, of any original base lease or property producing oil or gas for the first time in economic quantities on *or* after July 1 of the calendar year preceding the year in which such property is first assessed." (Emphasis added.)

Thus it becomes apparent that in the legislative process the word "or" in the original bill passed by the legislature somehow was changed to "and." As this court has interpreted Article 2, Section 14 of the Kansas Constitution to require the bill signed by the

Governor to be the same bill passed by the legislature, the petitioner claims this is a fatal error which invalidates the entire statute. *Harris v. Shanahan,* 192 Kan. 183, 387 P.2d 771 (1963); *State ex rel. Williams v. Robb,* 163 Kan. 502, 183 P.2d 223 (1947). Petitioner argues that the error in the statute as signed by the Governor is of such magnitude that it defeats the purpose of the statute. Petitioner, in his brief, states:

"This variation in the language of the bill appears in a very essential part of the enactment—the provision establishing the time at which a lease must first produce minerals in order to qualify for the special appraisal method. The variation, of course, was the substitution of the conjunctive 'and' for the disjunctive 'or.' If the special method of appraisal is to apply only to 'any original base lease or property producing oil or gas for the first time in economic quantities *on and after* July 1 of the calendar year preceding the year in which such property is first assessed' (emphasis added), then only those leases or property producing oil or gas for the first time in economic quantities *on* July 1 of the appropriate calendar year, *and* which continue to produce oil or gas thereafter, qualify under the statute. Thus, any lease or property which produced oil or gas for the first time in economic quantities *only after* July 1 of the calendar year would *not* qualify under the statute. Of course, the result would be otherwise if the requirement was 'on or after July 1.' "

While we have no quarrel with the holdings and principles of *Robb* and *Harris,* we do not think they are applicable to the case before the court. Concededly the "and" in the statute should have been "or" as contemplated by the legislature. However, the Director of Property Valuation has consistently interpreted the word "and" in the statute to be in the disjunctive rather than the conjunctive. That is, he applies the statute as if it read:

> The valuation of the working interest and royalty interest, . . . of any base lease or property producing oil or gas for the first time in economic quantities on July 1 or for the first time after July 1 . . . .

We think such construction is not only proper but correct under the facts and background of this case. In *Russell v. Cogswell,* 151 Kan. 793, 101 P.2d 361 (1940), this court stated:

"A liberal construction of statutes in order to effectuate their purpose is the established policy of this court. The function of liberal construction is called into use where there is ambiguity in the language of the statute or, in other words, where there are one or more interpretations which may fairly be made. Where clarification is required judicial interpretation is made that will give life to the statute rather than the one which will nullify it. Errors plainly clerical in character, mere inadvertences of terminology, and other similar inaccuracies or

deficiencies will be disregarded or corrected where the intention of the legislature is plain and unmistakable. But the court cannot delete vital provisions or supply vital omissions in a statute. No matter what the legislature may have really intended to do, *if it did not in fact do it, under any reasonable interpretation of the language used,* the defect is one which the legislature alone can correct." p. 795.

As stated in Black's Law Dictionary (4th ed.), "Or is frequently misused; and courts will construe it to mean 'and' where it was so used." p. 1246. The reverse is also true and courts will construe "and" to mean "or" when necessary to reflect the true meaning and intent of a statute. This court has long recognized the problem. In *Starr v. Flynn,* 62 Kan. 845, 62 Pac. 659 (1900), the use of the word "and" in an early statute obviously conflicted not only with the intent behind the statute but with another statute. The court stated:

"It is permissible to substitute 'or' for 'and,' and *vice versa,* to render legislative acts intelligible and effective. In Sutherland on Statutory Construction, section 252, it is said:

" 'The popular use of "or" and "and" is so loose and so frequently inaccurate that it has infected statutory enactments. While they are not treated as interchangeable, and should be followed when their accurate reading does not render the sense dubious, their strict meaning is more readily departed from than that of other words, and one read in place of the other in deference to the meaning of the context.' " pp. 848-9.

See also *Rostocil v. United Oil & Gas Royalty Ass'n,* 177 Kan. 15, 274 P.2d 761 (1954); *Kennedy v. Haskell,* 67 Kan. 612, 73 Pac. 913 (1903). We hold that as used in K.S.A. 1981 Supp. 79-331, the word "and" is to be read in the disjunctive rather than the conjunctive and therefore should be considered and applied as if it read "or" as originally intended by the legislature. Based upon such an interpretation and application, petitioner's first attack upon the statute lacks merit.

Petitioner's next contention is that subsection (*b*) results in differential treatment of properties appraised thereunder as to those under subsection (*a*) and therefore constitutes a violation of the uniform and equal clause of the Kansas constitution. Secondly, he contends that if the results obtained under subsection (*b*) are permissible then the classification established between subsections (*b*) and (*c*) is unconstitutionally discriminatory.

Article 11, Section 1 of the Kansas Constitution provides:

"The legislature shall provide for a uniform and equal rate of assessment and taxation, except that the legislature may provide for the classification and the

taxation uniformly as to class of motor vehicles, mineral products, money, mortgages, notes and other evidence of debt or may exempt any of such classes of property from property taxation and impose taxes upon another basis in lieu thereof. All property used exclusively for state, county, municipal, literary, educational, scientific, religious, benevolent and charitable purposes, and all household goods and personal effects not used for the production of income, shall be exempted from property taxation."

The taxation of oil and gas leases and properties does not fall within any of the allowable constitutional classifications or exemptions. Therefore, they are subject to K.S.A. 79-101, which states:

"All property in this state, real and personal, not expressly exempt therefrom, shall be subject to taxation in the manner prescribed by this act."

K.S.A. 79-329 through 79-334 as amended set forth the various statutory provisions for listing, valuation and assessment of oil and gas leases and properties. 79-329 declares such leases and properties to be personal property; 79-501 provides all real property and tangible personal property are to be appraised at fair market value; 79-503 defines fair market value while 79-1439 provides that all such property shall be assessed at 30% of fair market value. We need not here go into a long dissertation on the interrelationship between Article 11, Section 1 of the Kansas Constitution and the various statutes requiring all property (except such as is exempt or subject to separate classification) to be taxed uniformly and equally on the basis of fair market value. The subject has received exhaustive treatment on numerous occasions and need not be repeated. See *State ex rel. Stephan v. Martin,* 230 Kan. 759, 641 P.2d 1020, (1982); *State ex rel Stephan v. Martin,* 227 Kan. 456, 608 P.2d 880 (1980).

It appears to be the position of the petitioner that subsections (*a*) and (*b*) of K.S.A. 1981 Supp. 79-331 are mutually exclusive and therefore leases or properties which fall within subsection (*b*) are being valued, assessed and taxed on a different basis than those falling under subsection (*a*). We do not read the statute in such a manner. One of the factors to be considered under subsection (*a*) is "the quantity of oil or gas produced" during the taxable period. Subsection (*b*) requires that for any base lease on property which first produces oil or gas in economic quantities on "or" after July 1 of the initial taxable year, the quantity of oil or gas produced shall be taken into consideration as required by

subsection (*a*) but shall be first calculated on an annualized basis and then reduced by 40% to reflect the effect of flush production. Subsection (*b*) merely adds one more factor to the other statutory factors to be utilized in determining the fair market value when the property is subject to the misleading phenomena of flush production. As such it is merely one element to be used in certain cases to assure that the lease or property is more nearly appraised at fair market value the same as other leases or properties which have an actual production history which may be relied upon in making the determination.

This court has long recognized that the legislature may prescribe the manner in which certain property shall be appraised in order to arrive at fair market value. See *Bank v. Geary County,* 102 Kan. 334, 170 Pac. 33 (1918); *Hunt v. Allen County,* 82 Kan. 824, 109 Pac. 106 (1910); and *Francis, Treas., v. A.T. & S.F.Rld.Co.,* 19 Kan. 303 (1877).

K.S.A. 79-503 defines fair market value to be:

"Fair market value in money shall mean the amount of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting, assuming that the parties thereto are acting without undue compulsion and that the property has been offered at the market place for a reasonable length of time."

The statute then goes on to state certain factors or criteria which are to be considered in arriving at fair market value. The statute also defines various classifications of real property on the basis of urban and rural usage. The objective of the statute is to guide the county appraiser in arriving at fair market value. Oil and gas leases and properties are considered personal property and are also to be valued at fair market value as defined by the first sentence of K.S.A. 79-503. Being unique from the ordinary type of personal property, the legislature, in K.S.A. 1981 Supp. 79-331, has recognized certain criteria, other than those in 79-503, to be utilized in arriving at fair market value in money. The objective under both statutes is to reach the actual fair market value in the market place as opposed to a fictional, unrealistic, or arbitrary determination as was attempted in K.S.A. 1979 Supp. 79-342 (found unconstitutional in *State ex rel. Stephan v. Martin,* 227 Kan. 456), and K.S.A. 1981 Supp. 79-343 (found unconstitutional in *State ex rel. Stephan v. Martin,* 230 Kan. 759, 641 P.2d 1020 (1982), wherein special treatment was given to the valua-

tion of farm machinery which bore no reasonable relationship to the actual fair market value of the machinery. The statute here in question was adopted to furnish criteria to be utilized in appraising a certain category of property because the general criteria set forth in 79-503 were not applicable. However, the goal of K.S.A. 1981 Supp. 79-331 is the same, that is, to arrive at the actual fair market value of the property appraised.

In *Cities Service Oil Co. v. Murphy,* 202 Kan. 282, 447 P.2d 791 (1968), the court had before it a dispute over the valuation and subsequent assessment of several oil and gas leases. Expert testimony had been received at the trial level and resulted in a great variance in the valuation of the leases. The proper application of K.S.A. 79-331 as it existed prior to the 1979 amendments was involved and the court stated:

"As we have stated, the valuing of producing oil leases in compliance with K.S.A. 79-331, setting out eight factors, which must be considered as well as any other factors known by the assessor to affect the valuation of the property, is an extremely difficult operation. Most of the items set out in the statute are judgment factors and may easily result in great variations, although applied by expert petroleum engineers, as in this case. As may be seen by the thirty percent valuation figures enumerated the leaseholds, with which we are concerned, are very valuable. A slight difference of opinion as to the application of any of the statutory factors, in particular the probable life of the wells or rate of decline of future production, could cause wide variations in valuations." p. 288.

The determination by the legislature that certain oil and gas leases and properties were to be valued by considering an additional factor which applies to all leases and properties within the same factual category is not unconstitutional. In addition to the stipulations already set forth, affidavits attached to and made a part of the stipulations state that utilization of the subsection (*b*) factor "assists the county appraiser in arriving at a value which is not less than fair market value in money" and that "utilization of the decline adjustment factor set forth in K.S.A. 1980 Supp. 79-331(*b*) and (*c*) merely tends to moderate the peak production data so as not to allow *gross* over-assessment of wells having inadequate production histories." The use of the additional factor in subsection (*b*) to arrive at a more nearly accurate production factor required when leases or properties are subject to flush production does not result in unequal taxation because the factor is not applied to leases or properties which are not subject to flush

production. There is no evidence before this court to indicate that subsection (*b*) is being applied by the respondent, exclusive of subsection (*a*) factors, to any leases or properties. We cannot assume that such is the case.

In *Angle v. Board of County Commissioners,* 214 Kan. 708, 522 P.2d 347 (1974), the court was faced with a situation where the trial court found that certain oil and gas leases were appraised for taxation without certain relevant factors of K.S.A. 79-331 being taken into account. It appears that the leases in question produced from the Lansing oil reservoir and that production from that formation in that locality had a notoriously short life. The assessor failed to take into account such rapid decline thereby ignoring the statutory factor of "the probable life of the wells." We affirmed the trial court's decision that such intentional refusal by the taxing officials to take into consideration relevant factors set forth in the statute was arbitrary and rendered the assessments void. Conclusions of the trial court, which were affirmed on appeal, included:

" '11. *Since the assessor admitted he had not given effect to the anticipated rapid decline in production on these leases, and the uncontradicted evidence showed that his valuations were predicated on constant, nondeclining production, contrary to the known and undisputed facts,* the assessments in question must be held invalid. In those few instances where the assessor considered some decline in production *he ignored the actual rate of decline in production* so as to arrive at a higher valuation. Such assessments must also be held arbitrary and invalid because they failed to give effect to the actual facts then known. A method of valuation based solely on barrels of oil produced during part of a preceding year, without reference to other pertinent facts affecting market value, is "unquestionably void." *Richardson v. State,* 53 S.W.2d 508, at 510 (Tex.).' (Emphasis added.)" pp. 712-713.

If it should develop in practice that a county appraiser has assessed an oil and gas lease or property based solely upon the production factor of subsection (*b*) of the statute then such action might be found to be arbitrary. However, we cannot assume that such is the required result of the statute. On the contrary, we must assume that the entire statute will be considered as a whole and properly applied with subsection (*b*) being considered only in determining "the quantity of oil or gas produced" during the taxable period. When so applied to all leases and properties from which production of oil or gas for the first time occurs on or after July 1 of the initial taxing year, no violation of the fair and equal provisions of the Constitution result.

Finally, petitioner asserts that even if subsection (*b*) treatment of certain oil and gas leases or properties is valid, subsection (*c*) results in an unconstitutional discrimination between wells on the same lease or property in violation of Article 11, Section 1 of the Kansas Constitution. It is alleged that:

"[T]here is no rational basis for valuing the first original producing well on a lease upon a basis different than that used to value the second and subsequent producing wells on the same lease.

"If the method of appraisal prescribed in subsection (b) is designed to determine the fair market value in money of original producing wells, that method of appraisal should be equally applicable to all such wells whether they be the first well on a lease or a subsequent well thereon."

The argument of the petitioner misses the point. Wells, as such, are not being appraised but it is the entire lease or property which is being appraised. Production from the well or wells is one of the factors to be considered and, as indicated in the stipulation of facts, additional development wells on a particular lease are not ordinarily drilled by a prudent operator until a production history from the first well has been determined and the production from subsequent wells will normally parallel the production history of the first well. While these generalizations may be subject to dispute and while they obviously do not take into consideration the acreage involved, or the proximity of the subsequent wells to the first well, assuming such facts to be true, which we must do in view of the stipulation, it would appear that production from the subsequent wells could properly be calculated by comparison with the initial well without application of the subsection (*b*) formula or factor to arrive at the overall production from the lease or property.

Bound as we are by the stipulated facts before this court even though we recognize the same may be somewhat incomplete, and the legal principles which govern our consideration of the constitutionality of a statute, we cannot say that on the record before us, K.S.A. 1981 Supp. 79-331, or any of its sections, violates either Article 2, Section 14, or Article 11, Section 1 of the Kansas Constitution as alleged by the petitioner.

The petition for a writ of quo warranto is denied.