Nos. 81,512
81,513
81,514
81,515
81,516

ANDY MOON and MICHELLE MOON, CHARLES FITZGERALD and CHERYL FITZGERALD, EARL WATERS and DEE ANN WATERS, ROSALIE MCMASTER, and FRANCES ·WISDOM, *Appellants*, v. CITY OF LAWRENCE, *Appellee*.

(982 P.2d 388)

 Opinion filed July 9, 1999. 

*James L. Wisler*, of Schroer, Rice, P.A., of Topeka, argued the cause and was on the brief for appellants.

*Gerald L. Cooley*, of Allen, Cooley & Allen, of Lawrence, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is an appeal by the above-named homeowners from the trial court's granting of summary judgment and dismissal of their cases wherein they seek damages from the City of Lawrence (City) for damages to their real and personal property caused by flooding.

The trial court held the 2-year statute of limitations applied and plaintiffs' cause of action is barred by the statute of limitations. The trial court then held that even if the cause of action was not time barred, plaintiffs could not recover for reasons set forth by the trial court in its decision.

The homeowners raise seven issues on appeal. We do not reach most of the homeowners' issues because we agree with the trial court that the homeowners' cause of action is time barred.

The homeowners live in a two-block area "upstream" from Third and Wisconsin Streets in Lawrence, Kansas, which has had water drainage problems for many years. In 1958, a 369-acre drainage area was formed. As a result of construction of an access road to the Kansas Turnpike and engineers' recommendations, some water has been diverted and the area now drains some 329 acres. The Second and Michigan Street Drainage System was installed in 1958. A 5-year return period was the accepted standard in 1958. Oversimplified, the underground facility was designed to accommodate the surface water runoff from a rain that would be expected to occur on the average of once in a 5-year period.

The trial court sets out the facts as:

"13. The Second and Michigan Street Drainage System drains a three hundred eighty-five (385) acre, egg-shaped area encompassing (roughly) the Hillcrest area at Ninth Street and Iowa Street, the intersection of Sixth Street and Columbia Drive, Homestead Drive, and Second Street and Illinois Street.

"14. Surface water run-off from approximately one hundred twenty (120) acres of the above-described area drains directly into Centennial Park. At the north end of Centennial Park resides a pipe that drains the water from the park, underneath the Turnpike cloverleaf, into a culvert adjoining McDonald Drive.

"15. The surface water then travels down an open culvert on the east side of McDonald Drive. Eventually, the water passes behind the Lawrence Holidome at what is approximately Third Street and McDonald Drive.

"16. From that point, the water passes through an open channel to Third Street and Wisconsin Street. At Third Street and Wisconsin Street, the water enters a seventy-eight (78) inch inlet pipe and, from there, is intended to proceed underground. During times of heavy rain, the inlet pipe can no longer accommodate the surface water runoff.

"17. Underground, the water travels east down Third Street to Michigan Street where it makes a forty-five (45) degree turn. The water then enters an eighty-one (81) inch pipe and travels north down Michigan Street. At Second Street and Michigan Street, the pipe makes a ninety (90) degree turn and flows east down Second Street.

"18. Once the water reaches Second Street and Arkansas Street, it is discharged from an outlet pipe into an open channel that feeds, ultimately, into the Kansas River.

"19. In general, the Second and Michigan Street Drainage System area slopes from its southern boundary to the northeast. In other words, the southern boundary, near Hillcrest Shopping Center, is at the top of a hill and the Wisconsin Street and Michigan Street area is at the bottom of a hill.

"20. Within a few years of the construction of the streets and storm sewers in the Michigan Street system, the City became aware that the underground storm-drainage system was inadequate to convey the runoff that had been carried in the natural streams which ran through the area prior to 1958.

"21. Those who have lived in that area for an extended period of time report that the flooding problem has existed for over (30) thirty years.

"22. In the late 1960s, defendant commissioned Black & Veatch Consulting Engineers to survey various drainage systems and to identify solutions to problems within those systems.

"23. Black & Veatch identified the Second and Michigan Street Drainage System, among others, as being inadequate.

"24. By April, 1969, at the latest, defendant was well-aware that the Second and Michigan Street Drainage System was inadequate to protect local areas from flooding.

"25. To rectify the drainage deficiencies in the Second and Michigan Street Drainage System, Black & Veatch recommended three courses of action: (1) 'that a 60-inch R.C.P. relief sewer be constructed to carry the calculated 10-year flow (215 c.f.s.) from the large ditch along Third Street to the outlet at Second Street and Arkansas;' (2) 'that runoff from tributary areas west of the Turnpike access road be retained on the west side of this road . . . and that this flow be carried to the next drainage course to the north;' and (3) reduce 'the inlet capacity of the 54-inch corrugated metal culvert . . . in Centennial Park.'

"26. In its study, Black & Veatch estimated that the cost of complying with its recommendations would be $170,000.

"27. Defendant acted upon only two (2) of the recommendations. It retained the water on the west side of the Turnpike access road—now McDonald Drive—and it reduced the size of the culvert in Centennial Park by placing boards across the culvert so that water would pond in the park.

"28. Defendant did not construct a 60-inch R.C.P. relief sewer. While it is unknown why defendant abstained from adhering to that recommendation, it cannot be denied that the bulk of Black & Veatch's $170,000 estimate resided in the construction of that relief sewer.

"29. From the time that it was built in 1958 to the time of the June 5, 1996, flood, despite considerable development of the area and its knowledge of intermittent flooding, defendant never altered the underground section of the Second and Michigan Street Drainage System.

"30. Since 1958, other than to extend it and to implement two (2) of the recommendations of the Black & Veatch study, defendant has only, from time to time, inspected, maintained, and repaired the Second and Michigan Street Drainage System. Defendant has maintained it by removing debris that accumulates in open channels, catch basins, and pipes. Defendant has also repaired all broken pipes and catch basins.

"31. Between 1958 and June 5, 1996, additional catch basins or inlets were added as other streets within the system were developed.

"32. Since 1969, there has been significant development in the watershed's area upstream from the subject properties.

"33. The additional storm water runoff from these developments has increased the frequency and severity of flooding in the Michigan Street System.

"34. In 1980, the site and drainage plans for the Holidome development were submitted to the City for approval. The City was aware that the additional storm water runoff from the Holidome would aggravate flooding in the Michigan Street System. The City did not require the Holidome to provide on-site detention due to its proximity to the underground system and its position adjacent to the culvert.

"35. In 1985, the City approved the site plan for the Sallie Mae Office Building and parking lot. In 1989, the City approved the site plan for another Sallie Mae parking lot. Neither plan required storm water detention since the Sallie

Mae site drains directly into the channel that enters the Michigan Street System's underground drain pipe at 3rd and Wisconsin.

"36. On November 28, 1995, and on April 25, 1996, the City approved the site plan for the Highpointe Apartments with no requirement for on-site detention of storm water due to its proximity to a drainage ditch.

"37. The City was aware that the additional storm runoff from these or any developments that increased the amount of impervious area would aggravate the flooding problem in the Michigan Street System.

"38. Plaintiffs Michelle Moon and Andy Moon did not receive water in their basement until 1990-91. At that time, they experienced water around the corners and the walls. The water was three (3) to four (4) feet deep in their backyard. Since 1990 or 1991, their basement has flooded several times a year.

"39. Plaintiffs Michelle Moon and Andy Moon were so concerned about the flooding that they took preventative measures. After the 1990-91 flood, they removed shrubbery from their property and put in a double gate to assist the flow of water. They placed sandbags near window wells. They removed various valuable items from the basement.

"40. In 1993, water overlapped the foundation of plaintiffs Michelle Moon's and Andy Moon's house, ran across the basement ceiling, and, from the seams in the ceiling, rained into their basement. At that time, the water was waist deep in the streets. Because the basement floor slopes down from the center to the walls, the entire basement floor was not covered with the water, but three (3) inches of water accumulated at the edges along the walls.

"41. Plaintiffs Michelle Moon and Andy Moon observe that the flooding 'gets worse' every year.

"42. Twice during 1993 plaintiffs Charles Fitzgerald's and Cheryl Fitzgerald's backyard was flooded to a depth of two (2) feet. Plaintiff Cheryl Fitzgerald also noticed water in the yards abutting the rear of their property.

"43. During 1994 and 1995, (3) three feet of water came through plaintiffs Charles Fitzgerald's and Cheryl Fitzgerald's yard and, on each occasion, damaged plaintiff Charles Fitzgerald's lawnmower and the contents of a backyard shed. After the second time, plaintiff Charles Fitzgerald removed the lawnmower from the shed in his backyard and began storing it on his deck.

"44. In 1993, plaintiffs Earl Waters' and Dee Anne Waters' property flooded to the depth of (2) two inches in the yard. While the water did not breach the house (there is no basement) entirely, it did seep in around the edges. Plaintiffs Earl Waters and Dee Anne Waters noticed, at that time, that their carpeting was damp and that there was water in the garage.

"45. The house in which plaintiff Hedges resided was first flooded during the summer of 1978. From that time forward, the property flooded frequently. Sometimes, it flooded more than once a year.

"46. During 1993, plaintiff Hedges received thirty (30) inches of water in her basement. Her personal property was stored off the floor and was not damaged.

"47. In July, 1986, shortly after she moved into her house, plaintiff McMaster's basement was flooded to the depth of four (4) feet. Plaintiff McMaster reports that, between 1986 and 1993, her neighborhood suffered 'eight flooding disasters.'

"48. In 1993, plaintiff McMaster experienced two (2) or three (3) major floods. At times, the water outside her house was three (3) feet deep. Once, the water seeped through her front door. On several occasions in 1993, plaintiff McMaster's basement was flooded to the depth of three (3) to four (4) feet.

"49. In 1993, plaintiff Wisdom noted that the water rose to the level of three (3) to four (4) feet in the backyard. Water eventually entered the basement and rose to the level that it damaged many personal items.

"50. On approximately seven (7) or eight (8) occasions, plaintiffs Earnest Richardson and Clara Richardson had water at least as deep as six (6) inches in the yard.

"51. In 1993, the water reached a depth of two (2) inches in plaintiffs Ernest Richardson's and Clara Richardson's front yard. In the back yard the depth was fourteen (14) to sixteen (16) inches and was close to four and one-half (4 ½) feet deep by the back fence. The water against the foundation at the back of the house reached a depth of fourteen (14) inches. Water leaked into the basement through the windows and reached a depth of two (2) to three (3) inches.

"52. On June 5, 1996, between 5:00 a.m. and 8:00 a.m., slightly less than three (3) inches of rain fell on the City of Lawrence, Kansas. The morning storm was, approximately, of a two (2) to five (5) year frequency. The key effect of the morning storm was that it caused the soil to be very nearly saturated.

"53. When soil is saturated it acts like an impervious surface and increases the surface water run-off one might expect from a rain.

"54. Between 4:00 p.m. and 6:00 p.m. on June 5, 1996, the City of Lawrence, Kansas, received an additional 0.35 inches of rain.

"55. At approximately 10:00 p.m., it began raining again. Between 10:00 p.m. and 11:00 p.m., an additional 2.17 inches of rain fell. Between 11:00 p.m. and 12:00 a.m., another 1.36 inches of rain fell. In sum, the City of Lawrence, Kansas received 3.53 inches of rain over that two (2) hour period.

"56. The amount of rainfall in the two (2) hour period from 10:00 p.m. to 12:00 a.m. translates to a twenty-five (25) year rainfall; however, according to plaintiffs' expert, on a watershed of this size the critical storm duration is fifty (50) minutes which can be rounded to one (1) hour. The amount of rainfall in the one (1) hour period from 10:00 p.m. to 11:00 p.m. translates to a rainfall somewhat greater than ten (10) years."

The following statements of fact are uncontroverted according to the City's motion for summary judgment and plaintiffs' response

to that motion: In the late 1950s, the area relevant to these actions was prone to flooding. In 1969, the City commissioned Black & Veatch Consulting Engineers to survey various drainage systems and to identify solutions to problems within those systems. In the course of its study, Black & Veatch identified the Second and Michigan Street Drainage System, among others, as being inadequate. Thus, by April, 1969, defendant was well aware that the Second and Michigan Street Drainage System was inadequate to protect local areas from flooding. To rectify the drainage deficiencies in the Second and Michigan Street Drainage System, Black & Veatch recommended three courses of action: (1) that a 60-inch R.C.P. relief sewer be constructed to carry the calculated 10-year flow (215 c.f.s.) from the large ditch along Third Street to the outlet at Second Street and Arkansas; (2) that runoff from tributary areas west of the Turnpike access road be retained on the west side of this road and that this flow be carried to the next drainage course to the north; and (3) that the inlet capacity of the 54-inch corrugated metal culvert in Centennial Park be reduced. In its study, Black & Veatch estimated that the cost of complying with its recommendations would be $170,000. The City acted upon only two of the recommendations. It (1) retained the water on the west side of the Turnpike access road—now McDonald Drive—and (2) reduced the size of the culvert in Centennial Park so that water would pond in the park. However, the City did not, as recommended, construct a 60-inch R.C.P. relief sewer. While it is unknown why the City abstained from adhering to that recommendation, it cannot be denied that the bulk of Black & Veatch's $170,000 estimate resided in the construction of that relief sewer.

The standard of appellate review regarding summary judgment is as follows:

"The burden on the party seeking summary judgment is a strict one. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dis-

pute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal we apply the same rule, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citations omitted.]" *Mitzner v. State Dept. of SRS,* 257 Kan. 258, 260-61, 891 P.2d 435 (1995)

Plaintiffs' residences were flooded on June 5, 1996. They filed their petitions on May 6, 1997, less than a year from the date of that flood. The statute of limitations is 2 years. The City argues the statute of limitations began to run prior to June 5, 1996. The trial court agreed with the City, ruling that each of the plaintiffs

"knew by 1993 at the latest that during heavy rains the storm sewer would overflow and flood their property. Each had sustained substantial injury, as defined by the Court in *Johnson [v. Board of Pratt County Comm'rs,* 259 Kan. 305, 913 P.2d 119 (1996)], more than two (2) years before the filing of the cause of action. None of the actions was timely filed. Defendant is entitled to judgment as a matter of law on plaintiffs' claims."

Pursuant to K.S.A. 1998 Supp. 60-513(a)(4), an action must be brought within 2 years if it is an action for injury to the rights of another not arising on contract. K.S.A. 1998 Supp. 60-513(b) governs when a cause of action accrues. It provides:

"(b) Except as provided in subsections (c) and (d), the causes of action listed in subsection (a) shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, but in no event shall an action be commenced more than 10 years beyond the time of the act giving rise to the cause of action."

In *Roe v. Diefendorf,* 236 Kan. 218, 222-23, 689 P.2d 855 (1984), the court defined "substantial injury" as it is used in 60-513(b) as follows:

"Our decisions are reconcilable. The rule which has developed is: The statute of limitations starts to run in a tort action at the time a negligent act causes injury if both the act and the resulting injury are reasonably ascertainable by the injured person. In *Hecht [v. First National Bank & Trust Co.,* 208 Kan. 84, 490 P.2d 649 (1971)], neither the negligent act nor the injury were ascertainable until a later date. The stated rule provides a constitutionally permissible interpretation of K.S.A. 1998 Supp. 60-513(b). We hold the use of the term 'substantial injury' in the statute does not require an injured party to have knowledge of the full extent

of the injury to trigger the statute of limitations. Rather, it means the victim must have sufficient ascertainable injury to justify an action for recovery of the damages, regardless of extent. An unsubstantial injury as contrasted to a substantial injury is only a difference in degree, *i.e.*, the amount of damages. That is not a legal distinction. Both are injuries from which the victim is entitled to recover damages if the injury is the fault of another. A separate classification for the two, for purposes of limiting actions thereon, is in violation of the Equal Protection clause of the Fourteenth Amendment to the Constitution of the United States, because such classification has no legitimate legislative purpose. See *Henry v. Bauder*, 213 Kan. 751, Syl. ¶ 2, 518 P.2d 362 (1974). It is the duty of the judiciary to construe statutes in such a way, if possible, as to sustain the act's constitutionality. *State ex rel. Stephan v. Martin*, 230 Kan. 747, 641 P.2d 1011 (1982). Therefore, we construe the phrase 'substantial injury' in K.S.A. 60-513(b) to mean 'actionable injury.' "

In *Isnard v. City of Coffeyville*, 260 Kan. 2, 917 P.2d 882 (1996), the Isnards sued the City of Coffeyville in October 1991, alleging nuisance and negligent design after the City's underground storm sewer caused flood damage to their furniture store and warehouse during heavy rains, beginning in June 1985. The Isnards "experienced nine floods, all more than 2 years before filing of the action, caused by surface water backing up from the storm sewer after heavy rains between June 1985 and October 1989." 260 Kan. at 6. The district court granted summary judgment to the City, ruling the claims were barred by the 2-year statute of limitations under K.S.A. 60-513. The *Isnard* court, upon a petition for review, affirmed the trial court and reversed in part the decision of the Court of Appeals, stating:

"Although Isnard knew that the June 4, 1985, flooding was caused by the underground storm sewer system and he believed the system was inadequate, the Isnards continued to keep inventory in both buildings. They continued to experience flood damage on eight more occasions before October 9, 1989, 2 years before suit was filed. The storm sewer system is a permanent structure. The Isnards did not request abatement in their petition and do not suggest it as a likely possibility. At oral argument, counsel for the Isnards conceded that the City had never promised or agreed to do anything to rectify the problem. The most counsel could say was that the Isnards 'hoped and expected' that the City would do something." 260 Kan. at 7-8.

In affirming the Court of Appeals' ruling that the permanent damage claim for diminution of property value was time barred, the *Isnard* court held:

"Ascertainment should not mean that the Isnards could predict the dates when the flooding will occur or the exact severity of flooding. Before October 1989, the Isnards had enough experience with the floods to gauge how much rain would cause the storm sewer to overflow. In *Thierer*, 212 Kan. at 572-73 (although temporary damages were not preserved as an issue on appeal), we determined that the loss of a low water crossing in 1966 was reasonably ascertainable when plaintiff's levee broke in 1962. Likewise, flood damage to the Isnards' personal property and buildings from October 1989 to October 1991 was reasonably ascertainable before October 1989. Therefore, those damages, despite the label placed on them by the Isnards, are considered as permanent damages capable of being determined before commencement of the limitations period.

"Based on the record in this case, we agree with the Court of Appeals that the storm sewer is a permanent, non-abatable nuisance. Under *McAlister*, the Isnards' claims for all damages, past, present, and future, should have been brought in one action within 2 years of the time when those damages were capable of being determined." 260 Kan. at 10-11.

Further, the *Isnard* court noted:

"The universal rule is that municipal corporations are liable for damages occasioned to private property from the overflow of surface waters resulting from the fault of the municipality, its officers, and its agents. *Welch v. City of Kansas City*, 204 Kan. 765, 768, 465 P.2d 951 (1970) (citing *King v. City of Kansas City*, 58 Kan. 334, 49 Pac. 88 [1897] ).

"The City owed a duty not to cause an overflow of surface water onto the Isnards' property and is liable for damages." 260 Kan. at 4-5.

The *Isnard* court explained that in *Johnson v. Board of Pratt County Comm'rs*, 259 Kan. 305, Syl. ¶ 9, 913 P.2d 119 (1996), the court addressed the statute of limitations in the context of temporary and permanent damages from flooding. In *Johnson*, Oneita and Clara Johnson sued the Board of County Commissioners of Pratt County (the County) and Mid-Continent Engineers (MCE) for negligent design and construction of a new bridge over the Ninnescah River, upstream from their properties. The County filed a third-party claim for indemnification against the Kansas Department of Transportation (KDOT), which had been the County's agent during the design and construction of the bridge. The district court granted summary judgment for the defendants and dismissed the County's third-party claim against KDOT. The Court of Appeals reversed in part, affirmed in part, and remanded. *Johnson v.*

*Board of Pratt County Comm'rs,* 21 Kan. App. 2d 76, 77, 897 P.2d 169 (1995).

The *Johnson* court affirmed the Court of Appeals in part and reversed in part, finding that summary judgment was not the proper procedural vehicle for resolving the case. The *Johnson* court noted that whether an injury is permanent or temporary

"is the determinative factor in commencing the statute of limitations in damage actions from flooding allegedly caused by construction. *Dougan v. Rossville Drainage District,* 2 Kan. App. 2d 125, 128, 575 P.2d 1316, *rev. denied* 225 Kan. 843 (1978) (citing *Henderson v. Talbott,* 175 Kan. 615, 621, 266 P.2d 273 [1954]). See also *Gowing v. McCandless,* 219 Kan. 140, 145, 547 P.2d 338 (1976) (owner of land injured by overflows and poor drainage caused by abatable condition or nuisance has right to assume condition or nuisance will be abated; evidence showed obstructions were not 'permanent' and could be removed from the drainage ditch; obstructions also were not 'permanent' in a legal sense because they were not approved by the Division)." 259 Kan. at 320.

The *Johnson* court commented on *Thierer v. Board of County Commissioners,* 212 Kan. 571, 512 P.2d 343 (1973), and stated:

"In *Thierer,* the Geary County Commissioners in 1959 altered the channel of a stream during the relocation of a bridge and county road. Henry and Nellie Thierer were upstream property owners. In 1962, a levee broke as a result of the alteration. The Thierers' property was flooded. The Thierers repaired the levee. In 1966, they noticed that a low water crossing to their property was no longer passable. The levee broke again. Again the Thierers' property flooded. The commissioners unsuccessfully attempted to restore the low water crossing in 1966 and 1967. In 1967, the Thierers filed suit, seeking damages and a mandatory injunction to restore the low water crossing and return the upstream channel to its former condition. The district court awarded a mandatory injunction to have the low water crossing restored but denied damages, determining that the Thierers were seeking permanent damages that were reasonably ascertainable in 1962. We reversed the mandatory injunction award and affirmed the dismissal of the damages count, reasoning that all counts were time barred." 259 Kan. at 321.

The *Johnson* court also commented on *Dougan*:

"*Dougan,* 2 Kan. App. 2d 125, addressed the question of when a cause of action for permanent damages from flooding accrues. The drainage district made a number of alterations to a network of drainage ditches and waterways between 1942 and 1954 without the knowledge and consent of the Division's chief engineer. Dougan experienced flooding in 1967 and 1973 as a result of the alterations. After the 1967 flood, Dougan discussed a possible solution with the drainage district. The drainage district did some dredging work, at its own expense. Dougan filed

suit in 1974 after the 1973 flooding, seeking a permanent injunction, permanent damages to real estate, and temporary damages for lost crops. The district court granted the drainage district's motion for summary judgment, determining that Dougan's permanent damages claim accrued in 1967 and the action was time barred. The Court of Appeals reversed, observing: 'The flooding in this case is temporary, occasional and recurrent. There is no indication or allegation that the flooding caused permanent injury to the land itself in 1967.' 2 Kan. App. 2d at 129." 259 Kan. at 322.

## The *Johnson* court held:

"A genuine issue of material fact exists as to whether Oneita's 1988 damages were temporary or permanent. In the literal sense, Oneita's property suffered erosion in 1988 that is permanent in nature. Nothing will bring back the soil that is gone. In addition, the cause of the erosion, the bridge, is without question a permanent structure. All agree that the erosion will continue, absent corrective measures. However, in 1988, the County took some remedial action in response to Oneita's complaints after the flood. The County's conduct in this case does not give rise to an equitable estoppel, but it does raise the issue of whether Oneita thought the cause of her damage was abatable in 1988. Viewing the facts most favorably to Oneita, she complained to the County as soon as she suffered erosion. The County responded by doing some work in an effort to solve the problem. Afterward, she had her attorney ask if the County was going to do any riprapping, and the County said riprapping was not necessary. Oneita may have thought that the cause of her injury was abated at that point. She would have no reason to believe the bridge would be removed, which is not what she had requested. But she may have had reason to believe that the County had solved the erosion problem. She had no further dealings with the County until after the 1991 flood. At that point, she realized the problem was not solved. She and Clara had riprapping done themselves. Oneita did file suit within two years of the 1991 flood.

. . . .

". . . The trier of fact in the present case must determine what is to be considered the natural watercourse: the river, as altered by the old bridge, or the river, without regard to the presence of any bridge. As discussed previously, there remain material issues of fact as to whether the Johnsons have any prescriptive rights to the condition of the river as it existed with the old bridge. The trier of fact must then find whether the new bridge changed the channel or stream, causing substantial injury to the Johnsons' properties. If substantial injury is found, then the nature (permanent or temporary) and extent of the damages and relief (monetary, injunctive, or both) to which the Johnsons may be entitled must be determined." 259 Kan. at 323, 330.

In holding that the Isnard's claim was barred by the statute of limitations, the *Isnard* court relied on *Johnson* and stated:

"Like *Johnson*, this case involves a permanent structure. Unlike *Johnson*, the City never promised or made any remediation or abatement efforts after the many floods. The Isnards have not requested abatement, and at oral argument, their counsel did not suggest it as a realistic possibility. The question of abatability is not a material issue of fact. Even the Isnards assume the whole system would need to be replaced to solve the flooding problem. *Johnson* involved two floods of a river in a 3-year span, one flood being more than 2 years before filing the action. In this case, the Isnards experienced nine floods, all more than 2 years before filing of the action, caused by surface water backing up from the storm sewer after heavy rains between June 1985 and October 1989." 260 Kan. at 6.

The City argues the Second and Michigan Street Drainage System and, in particular, its underground section, is a permanent and fixed structure. The City asserts *Isnard* and *Johnson* support the claim that the system is a permanent structure because the *Isnard* court found that the city storm sewer in question was a permanent nonabatable nuisance.

Plaintiffs have a point that parts of the system were not permanent, but simply because parts of the system could arguably be characterized as temporary, does not mean the Second and Michigan Street Drainage System is not a permanent structure. The decision by the *Isnard* court regarding an underground sewer system controls the outcome of this issue. The *Isnard* court specifically held that the City's underground storm sewer was a permanent structure and the "whole system would need to be replaced to solve the flooding problem." 260 Kan. at 6.

In the present case, the trial court concluded plaintiffs' claims were barred by the statute of limitations because their actions were not brought until May 6, 1997. The trial court found the causative structure was permanent, plaintiffs' damages were permanent, and plaintiffs could have determined by 1993, at the latest, that they would be damaged during heavy rains.

Like *Johnson* and *Isnard*, this case involves a permanent structure. Unlike *Johnson*, the City never promised or made any remediation or abatement efforts after the many floods. If the Second and Michigan Street Drainage System is a permanent structure and plaintiffs have experienced flooding since 1993, plaintiffs' damages are permanent, not temporary, and the statute of limitations began to run in 1993. Like the plaintiffs in *Isnard*, plaintiffs in the present

case knew they had been flooded before and the City had not promised or attempted to abate the cause of damage.

The language in *Baldwin v. City of Overland Park*, 205 Kan. 1, 7-8, 468 P.2d 168 (1970), is relevant:

"In the case at bar there is no indication the city disturbed in any way the natural drainage of the twenty block area in which plaintiffs' property is located. According to the evidence and a map submitted by the parties the ditch must, from force of gravity, be characterized as a natural drainway for surface waters. Its course has not been altered. No new water has been collected and diverted into it from some other area or source. Obviously, in determining liability, a distinction exists and should be made between the discharge of surface water into a natural drainway on a person's property and discharging it on land where it would not have naturally gone. A municipality has no right to alter the course of drainage of surface water so as to throw water upon property where it does not naturally flow (see 2 Farnham, Waters and Water Rights, § 184).

"Plaintiffs' real complaint here seems to be based on the fact that because of the city's growth and development the ditch came to carry a sufficient volume of water to erode plaintiff's wall into collapse and subsequently to invade their basement. Whenever a structure is erected in a city, whether it be house, driveway, sidewalk, street or whatever, the area for natural percolation of water is diminished and the flow of surface water is to that degree altered. Every new brick adds to the runoff. Where rapid growth has occurred the resultant problem is primarily an economic one for cities and citizenry and, under the present state of our law, its solution properly lies in concerted political action rather than in the courts."

Affirmed.