The BRADBURY CO., INC. Plaintiff,

v.

Andre TEISSIER–DUCROS; Georgia P. Bevis; Gean Overseas, Inc.; Gean Overseas/Bossard, Inc.; and ASC Machine Tools, Inc., Defendants.

Andre Teissier–duCros and Gean Overseas, Inc., Counter Plaintiffs,

v.

The Bradbury Co., Inc.; Strilich Technologies, Inc.; American Machine & Rollform Tech, Inc.; Marion Die & Fixture; Hayes International; and Beck Automation; David Bradbury, in his individual capacity; and Chad Bradbury, in his individual capacity, Counter Defendants.

No. 03–1391–WEB.

United States District Court, D. Kansas.

Feb. 2, 2006.

See, also, 2005 WL 2972323.

J. Michael Kennalley, Martin & Churchill Chartered, Wichita, KS, for Plaintiff.

Christian R. Cox, Robert Allen Dunn, Dunn & Black, Spokane, WA, Kenneth G. Gale, Monte A. Vines, Adams & Jones, Chartered, Wichita, KS, for Defendants.

Andre Teissier-duCros, Decatur, GA, pro se.

Georgia P. Bevis, Decatur, GA, pro se.

Gean Overseas, Inc., Decatur, GA, pro se.

### MEMORANDUM AND ORDER

WESLEY E. BROWN, Senior District Judge.

Now before the Court is Defendant ASC Machine Tools, Inc's (ASC) motion for partial summary judgment. (Doc. 221). The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332. Plaintiff, Bradbury Company, Inc. (Bradbury) and ASC are competitors in the manufacturing and sales of rollforming equipment. Bradbury alleges that Andre Teissier-duCros (ATC), Georgia P. Bevis (GPB), Gean Overseas, Inc. (GOI), and Gean Overseas/Bossard, Inc. (GOB) (duCros Defendants) were bound by non-disclosure and no-compete contracts. Bradbury has sued ASC for violating the uniform trade secrets act and tortious interference with the non-disclosure and no-compete contracts. Bradbury has requested a permanent injunction and monetary damages. In this motion, ASC argues that Bradbury's claims for tortious interference with these contracts are barred by Kansas' two-year statute of limitations.

### I. SUMMARY JUDGMENT STANDARD.

Summary judgment is appropriate when "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims..." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court views the evidence and all reasonable inferences in favor of Bradbury, the non-moving party. *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1108 (10th Cir.2001). A fact is "material" if under the substantive law it is essential to the proper disposition of the claim. *Adler v. Wal–Mart Stores*, 144 F.3d 664, 670 (10th Cir.1998). "An issue is genuine if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.*

"The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Id.* at 670–671. The movant can do this by demonstrating a lack of evidence on an essential element of the nonmovant's claim. *Id.* at 671. "If the movant carries this initial burden, the nonmovant that would bear the burden of persuasion at trial may not simply rest upon its pleadings; the burden shifts to the nonmovant to go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Id.* (citing Fed.R.Civ.P. 56(e)).

### II. MATERIAL FACTS.

For purposes of this motion, the following facts are uncontroverted or, if disputed, are viewed in a light most favorable to

Bradbury, the non-moving party. Immaterial facts and facts not properly supported by the record are omitted.

1. Bradbury entered into an agreement with GOB for a variety of consulting services in 1994. (Doc. 106, Def. Ex. A). Under this agreement, GOB agreed that it would not render services to competitors for one year from the date of the last invoice. (Id.). GOB also agreed to maintain the confidentiality of Bradbury's sensitive information. (Id.).

2. Bradbury entered into an agreement in 1999 with GOI on November 11, 1999 for a variety of consulting services. (Doc. 106, Def. Ex. C at 10). In this agreement, GOI agreed to a non-disclosure covenant which would permanently survive the termination of the 1999 agreement. (Id. at 6). The 1999 agreement states, "that any idea, or original concept, generated or discovered during the assignment will be Bradbury Group's property. Gean Overseas will disclose to a third party Bradbury Group's identity, strategy, plans, intentions, or know how only with Bradbury Group's permission...". (Id.).

3. The duCros defendants modified the 1999 agreement by orally agreeing to a no-compete agreement with no time limitation in exchange for an increase in their role and compensation. (Pl. Ex. B–4 at 366: 21–25, 367: 1–9, 378: 1–25, 379: 1–25 and 380: 1–17); (Pl. Ex. B–5 at 546: 24 to 547: 2 and 548: 21 to 549: 14).

4. ATC is the President of GOI and GOB. (Doc. 106, Def. Ex. A, C). GPB is an employee of GOI. (Doc. 106, Def. Ex. C).

5. The 1999 agreement effectively terminated on February 28, 2001 and the last time ATC performed services for Bradbury was July 2001. (Pl. Ex. B–3 at 31: 7–17 and 32: 2–5).

6. ASC is Bradbury's competitor. (Def. Ex. E at 243: 5–9); (Doc. 109, Def. Ex. C at 2).

7. ATC was privy to Bradbury's confidential information. (Doc. 251, Pl. Ex. B–3–a–1 at 50: 13–20) (Doc. 251, Pl. Ex. B–2–a–1 at 56: 3–9).

8. ASC and GOI entered into negotiations in early October 2001 for GOI to provide consulting services to ASC. (Doc. 216, Cornell Aff. ¶ 4). ASC and GOI entered into a contract for consulting services on October 17, 2001. (Id. ¶ 5).

9. ASC and Bradbury both attended a metal building industry trade show known as Metalcon which was held from October 23, 2001 through October 25, 2001. (Moseanko Aff. ¶ 2); (Def. Ex. A at 186: 1–3).

10. At this show, Scott Thompson, ASC's Vice–President of Sales, talked to Chad Bradbury, Bradbury's Director of International Sales. (Def. Ex. A at 187: 5–12). Chad Bradbury described the conversation with Thompson as small talk, off the cuff, casual, and meaningless chit chat. (Pl. Ex. B–2 at 189: 6–14).

11. Chad Bradbury asked Thompson if ASC was looking to hire ATC. (Pl. Ex. B–1 at 132: 15–25). Thompson did not give him a specific answer; instead, Thompson told him that ATC was poking around at ASC. (Id.). Chad Bradbury states that during this conversation with Thompson, he was told that ATC was working for ASC. (Pl. Ex. B–2 at 189: 6–14 and 190: 10–14).

12. Chad Bradbury states that he became aware that ATC was working for ASC during this conversation. (Pl. Ex. B–2 at 188: 24 to 189: 14). Almost ten minutes after the conversation with Thompson, Chad Bradbury reported to Bradbury's CEO and/or COO, David Bradbury and/or David Cox, that ATC and GOI were now working for ASC. (Pl. Ex. B–2 at 191: 1–25).

13. Bradbury's COO, David Cox, stated that he became aware that ATC was work-

ing for ASC during the Metalcon trade show in October 2001. (Pl. Ex. A); (Def. Ex. B at 265: 3–7 and 267: 17–22). Cox and Chad Bradbury understood that ATC was working for ASC because of the conversation with Thompson and because Bradbury's talks to acquire ASC had been canceled about six weeks prior to the trade show. (Def. Ex. 4 at 265: 15 to 266: 23 and 267: 17–22).

14. On November 6, 2001 David Bradbury followed up on the conversation at the trade show by flying to Atlanta to meet with ÀTC. (Pl. Ex. B–4 at 268: 25 to 266: 3). When David Bradbury asked ATC if he was working for ASC, ATC refused to answer. (Id. at 268: 5–20).

15. On November 9, 2001, Michael Biggs, Bradbury's attorney, wrote a warning letter to ATC and GOB. (Pl. Ex. B–8). It stated:

> It is our understanding that you are presently advising ASC Machine Tools, Inc. and their ownership ("ASC") and either presently are, or intend to, facilitate the sale of ASC machine Tools, Inc. to a third party...It is improbable that you may play any of the aforementioned roles without violating the confidentiality covenants set forth in the afore-mentioned Confidential Proposal Agreement. Demand is hereby made that you cease and desist from further broker or consulting activities on behalf of either of these companies...

(Id. at 264: 2–6); (Pl. Ex. B–8).

16. On November 15, 2001 Janice Sharp, the attorney for GOI and ATC, responded in a letter which stated "neither Mr. Teissier-duCros or any other employee or authorized agent of Gean Overseas is advising ASC or any of the competitors of the Bradbury Company, Inc. (the 'Bradbury Company') in any way that might constitute a violation of the Non-disclosure Covenants." (Pl. Ex. B–9).

17. In a letter dated November 16, 2001, Michael Biggs warned Ray McGriff, President of ASC, not to interfere with Bradbury's covenants with the duCros defendants. (Pl. Ex. B–10).

18. Bradbury filed this suit on November 04, 2003. (Doc. 1).

### III. TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS.

In a diversity action, a federal court must apply the conflicts of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–497, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). When analyzing choice of law provisions in an action for tort, the Court will apply the Kansas rule of *lex loci delicti,* or the site of the injury. *Ling v. Jan's Liquors,* 703 P.2d 731, 735, 237 Kan. 629, 634 (1985). The injury in this case is financial. Bradbury is a Kansas corporation; therefore, the financial injury was felt in Kansas. *St. Paul Furniture Mfg. Co. v. Bergman,* 935 F.Supp. 1180, 1187 (D.Kan.1996). The Court will apply Kansas law.

The essential elements for an action for tortious interference with a contract are: 1) a contract between plaintiff and a third party; 2) the wrongdoer's knowledge thereof; 3) his intentional procurement of its breach; 4) the absence of justification; and 5) damages resulting therefrom. *Dickens v. Snodgrass, Dunlap & Co.,* 872 P.2d 252, 257, 255 Kan. 164, 168 (1994).

Kansas law provides a two-year limitations period for tort actions and it applies to claims for tortious interference with contractual relations. Kan. Stat. Ann. § 60–513(a)(4); *Sports Unlimited, Inc. v. Lankford Enterprises, Inc.* 93 F.Supp.2d 1164, 1167 (D.Kan.2000). A cause of action for tortious interference with contractual relations accrues when,

the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party.

Kan. Stat. Ann. § 60–513(b).

"An injury is reasonably ascertainable when the plaintiff knew or could reasonably have been expected to know of the alleged [tort]." *Knight v. Myers*, 748 P.2d 896, 901, 12 Kan.App.2d 469, 474 (1988). "The term 'reasonably ascertainable' does not mean 'actual knowledge' but is 'an objective standard based on an examination of the surrounding circumstances.'" *Burton v. R.J. Reynolds Tobacco Co.*, 397 F.3d 906, 921 (10th Cir.2005) (*citing Davidson v. Denning*, 914 P.2d 936, 943, 948, 259 Kan. 659 (1996)); *Kan. Pub. Emples. Ret. Sys. v. Blackwell*, 114, F.3d 679, 689 (8th Cir.1997) (Kansas law does not require actual knowledge of an injury, rather only such notice to permit him to discover the injury with due diligence).

The term substantial injury means "the victim must have sufficient ascertainable injury to justify an action for recovery of the damages, regardless of extent." *Moon v. City of Lawrence*, 982 P.2d 388, 395, 267 Kan. 720, 728 (1999). Kansas courts construe "substantial injury" in Kan. Stat. Ann. § 60–513(b) to mean "actionable injury". *Id.*

To prevail on this motion for partial summary judgment, ASC "must show, as a matter of law, that there is an absence of evidence to support the plaintiff's claim that the fact of injury from the alleged tortious interference could not reasonably be ascertained by plaintiff[ ] more than two years" before November 4, 2003, when this action was filed. *Phillips USA, Inc. v. Allflex USA, Inc.*, 869 F.Supp. 842, 851 (D.Kan.1994).

*A. No-compete covenant.*

■ ASC has presented facts showing that injury to Bradbury's no-compete covenants was reasonably ascertainable more than two years before this action was filed. Statements from Cox and Chad Bradbury unequivocally show that they indeed understood Thompson's statements at the trade show to mean that ATC was working for ASC. *Resolution Trust Corp. v. Scaletty*, 891 P.2d 1110, 1115, 257 Kan. 348, 356 (1995) (knowledge to a corporation comes through its officers, directors, and employees).

Chad Bradbury not only had actual knowledge that ATC and GOI were working for ASC but he called either Bradbury's CEO or COO to share this information. Chad Bradbury responded to the following questions:

A. I called them on my cell phone

Q. Okay and who specifically did you contact?

A. I want to say I got David Cox, but it could have been David Bradbury

Q. Okay. What did you relate to your dad?

A. I told him what I just told you, that Scott had mentioned that [ATC] and [GOI] was now working for ASC.

(Pl. Ex. B–2 at 191: 5–12).

Moreover, less than two weeks after the trade show David Bradbury flew to Atlanta to visit ATC and verify Thompson's statements. While this occurred after November 4, 2001 it shows that Thompson's remarks prompted an investigation by David Bradbury. *Bagby v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 104 F.Supp.2d 1294, 1298 (D.Kan.2000) (the term "reasonably ascertainable" carries with it an obligation to investigate available factual sources) (internal citations omitted). These facts all support the con-

clusion that Bradbury knew ATC and GOI were working for ASC at the trade show.

Bradbury presents no facts to contradict this evidence; instead, it argues that there exists a genuine issue of fact about the actual words spoken by Thompson at the trade show. Bradbury relies on an affidavit by Cox which describes Thompson's statement as nothing more than a rumor, as if that characterization alone somehow negates Chad Bradbury's and Cox's testimony and creates an issue of material fact. It does not. Moreover, this fact is not material because regardless of the exact words spoken by Thompson, it is apparent that after the conversation, Plaintiff understood those comments to mean that ATC and GOI had been hired by ASC.

The Cox affidavit also makes hollow statements that following the trade show, Bradbury had no knowledge that its no-compete covenant with the duCros defendants had been breached. (Pl. Ex. A ¶¶ 8, 10, 14, 15, 17). These statements are unsupported by the record. The affidavit does not deny facts showing that Chad Bradbury and Cox knew from Thompson's remarks that ATC and GOI were working for ASC. Nor does the affidavit deny that Chad Bradbury informed Bradbury's CEO and/or COO (David Bradbury and/or David Cox) that ATC and GOI were working for ASC. The affidavit's statements are conclusory and unsupported and are not sufficient to withstand a motion for summary judgment. *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir.1991).

Finally, Bradbury argues that the injury was reasonably ascertainable only after Bradbury warned ASC in the November 16 letter that hiring ATC would violate its contracts with the duCros defendants. This argument is unpersuasive. The letter was written because Bradbury had already ascertained its injury as a result of having discovered ATC and GOI were working for ASC. The date when Bradbury made this discovery is the when the injuries to the covenants became reasonably ascertainable, not the date of a letter warning of potential liability.

The Court finds there is no genuine issue of material fact that Bradbury had actual knowledge that ATC and GOI were working for ASC no later than the last day of the trade show on October 25, 2001. Moreover, ATC's status as President of GOB and GPB's status as an employee of GOI make the injuries to Bradbury's no-compete covenants with GOB and GPB at least reasonably ascertainable as of October 25, 2001. Consequently, this claim is not timely and is barred by the statute of limitations.

## B. *Non-disclosure covenant.*

■ ASC argues that the statute of limitations also bars Plaintiff's claim that ASC interfered with Bradbury's non-disclosure covenant because Plaintiff is relying on the inevitable disclosure doctrine. (Def. Ex. C at 8–9). The inevitable disclosure doctrine is a theory of relief for claims of misappropriation of trade secrets when an employee's new employment will inevitably lead him to rely on his former employer's trade secrets. *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir.1995). Under this doctrine a plaintiff can obtain relief when:

> (1) the employers in question are direct competitors providing the same or very similar products or services; (2) the employee's new position is nearly identical to his old one, such that he could not reasonably be expected to fulfill his new job responsibilities without utilizing the trade secrets of his former employer; and (3) the trade secrets at issue are highly valuable to both employers.

*EarthWeb, Inc. v. Schlack*, 71 F.Supp.2d 299, 310 (S.D.N.Y.1999).

Bradbury does not contest reliance on the inevitable disclosure doctrine; instead, it disputes when the injury from ASC's employment of GOI was reasonably ascertainable.[1] These are the same unpersuasive arguments the Court addressed with respect to the no-compete covenant. Bradbury knew the duCros defendants had Bradbury's confidential information and it knew that ASC was a direct competitor. Therefore, injury to Bradbury's non-disclosure covenant with the duCros defendants under a theory of inevitable disclosure was reasonably ascertainable when Bradbury discovered ATC and GOI were working for ASC on October 25, 2001.

Kansas has yet to address the inevitable disclosure doctrine. The Court does not need to determine if Kansas courts would adopt this doctrine because even if this doctrine were the law in Kansas, Plaintiff's claim, insofar as it relies on this theory, would be barred by the statute of limitations.[2]

It is therefore ORDERED that Defendant's Motion for Partial Summary Judgment (Doc. 221) be GRANTED.

---

1. Bradbury alleges "it was and continues to be impossible for the duCros Defendants to provide consulting services to ASC without using and disclosing the trade secrets and proprietary and confidential commercial information of Bradbury." (Def. Ex. D at 5); see (Pl. Ex. B–8).

2. The Court expresses no opinion on Plaintiff's claims for tortious interference with contract that are based on actual disclosure.